## McDermott *et al. versus* Hoffman.

1. A caveat was entered April 6th 1795, to returns of certain surveys in different blocks; in an ejectment for two surveys in one of the blocks, made August 25th 1794, returned, and patented to Barton, a certified copy of an agreement of the original owners, Barton being one, to settle the line between the two *blocks*, entered into and filed in the caveat before the Board of Property, could not shift the location of the lands in controversy.

2. The agreement, reciting that it had been made on the basis of a draft, then before the parties, stated the location of the tracts within the blocks, and was offered as an admission of Barton, under whom the plaintiff claimed, of the location of the land in dispute, the draft not being produced or accounted for: *Held*, inadmissible without the draft.

3. The defendants offered in evidence the record of an ejectment by Barton against other parties for other lands;—the record containing a bill of exceptions,—on the ground that the testimony in that case was evidence of the admissions of Barton as to the location of the lands: *Held*, to be inadmissible; the testimony of a party's witnesses in one suit not being evidence against him in another suit for a different subject.

4. By producing a witness, a party admits for that case that he is credible, but does not admit that everything he says is true. He may contradict his witness or show he was mistaken, but he cannot directly impeach his veracity.

[McDermott *v.* Hoffman.]

5. Where the record of a former suit is evidence, parol evidence may be given of what transpired on the trial to show that it was the same subject-matter which was passed upon.

6. The original assessment of unseated lands contained the name of warrantee, number of acres, valuation and rate, but the amount of tax was not carried out: *Held*, to be evidence of the assessment of the land, which became debtor by being returned assessed and valued, and the rate fixed.

7. Treasurer's deeds for lands in the same block with that in dispute were evidence to show *location*, although not accompanied by evidence of an assessment and valid sale for taxes; but would not have been evidence to show title.

8. Assessment to a party is not of itself evidence to establish adverse possession, but may be corroborative, if there be other evidence of possession.

9. When a case is ordered to be tried by a struck or special jury, no special venire is necessary to summon the jury.

10. A special venire is required only in case of a view.

11. An objection to the regularity of summoning a jury should be by challenging the array; and an exception to it taken before the jury is sworn.

12. A peremptory challenge may be made to a juror on a struck list.

13. Location of lands under the land law of Pennsylvania considered in this case.

14. Truby *v.* Seybert, 2 Jones 101, distinguished.   Schwenk *v.* Umsted, 6 S. & R. 351, recognised.

October 24th 1871.   Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Cambria county :* No. 138, to October and November Term 1870.

This was an ejectment brought April 30th 1863, by Murray S. Hoffman, Jr., against James McDermott, John McDermott and Henry McDermott (who were served), and three others not served. Henry McDermott afterwards died, and his death was suggested on the record.

The action was to recover 200 acres of land, part of two tracts warranted in the names of Hillery Baker and Peter Wager.

The warrants under which the plaintiff claimed were two of a batch of 52 warrants and surveys, patented to William Barton, and known as "Barton 52."   They had been returned with a batch of warrants known as the "Armant."   The principal question was as to the location of the lands in controversy : whether the lands in the possession of the defendants were covered by the Baker and Wager warrants, or located on the ground.

The record showed the following entry :—

" And now, September 8th 1869, on motion of Messrs. Blair and Johnston, rule for a special jury, returnable at argument court."

" And now, October 14th 1869, rule for striking a special jury made absolute.   December 13th 1869, jury struck in prothonotary's office, agreeably to the order of court of October 14th 1869."

Each party struck 12 names, leaving on the panel 24 jurors. The case being called for trial before Taylor, P. J., 12 of the 24 jurors were called into the box ; the plaintiff claimed the right of peremptory challenge, as in other cases, conceding the same right

to the defendants, and challenged Emanuel Dishart.   The defendants objected that the plaintiff, having entered a rule for special jury and joined in striking, was excluded from peremptory challenges.   The objection was overruled and the challenge allowed; the court sealed a bill of exceptions for the defendants.

The plaintiff gave in evidence a warrant of January 28th 1794, to Philip Wager for 400 acres adjoining Peter Benson on the east, in the county of Huntingdon; survey to Wager, August 22d 1794, for 433 acres and 153 perches; and patent for same February 23d 1796, to William Barton; also a warrant of same date for 400 acres to Hillery Baker; survey August 25th 1794, to Baker for 433 acres and 153 perches, and patent February 25th 1796, to William Barton.

The plaintiff offered in evidence the assessments in Allegheny township on unseated list for 1820 and 1821, and called John A. Kennedy, one of the commissioners of Cambria county.   He testified that he had frequently seen the assessments in the vault in the commissioners' office, believed them to be the original assessments, and he knew of no other books containing the assessments. The defendants objected to the offer; that the books did not show any assessment against the land in question; that the statement of taxes in sales-book in the treasurer's office does not justify a sale for taxes, he not being an assessing officer.   The offer was admitted and a bill of exceptions sealed.

This evidence was as follows:—

" Allegheny unseated list for 1820.
WARRANTEE NAMES:
John Murray & Sons.

| Acres. | Perches. | | Rate. | Valuation. | Taxes. |
|--------|----------|-------------|-------|------------|--------|
| 433 | 153, | Wager, Philip | 6, | $108.25. | |

Allegheny township unseated list for 1821: precisely the same.

1822, Treasurer's deed.   David Tod, Treasurer for the Philip Wager tract, December 3d 1822, to William Bayard and Henry Barklay."

Also, treasurer's sales-book for 1826; Hillery Baker 433 acres 154 perches, July 31st 1826, to William Bayard and Henry Barklay; and treasurer's deed dated October 5th 1826, to Bayard and Barklay.

The plaintiff gave evidence showing that the title of Bayard and Barklay was vested in the plaintiff in 1854; also evidence by Richard J. Proudfoot, James L. Gwinn, James M. Gibboney, David McHugh and others, that the location of the Baker and Wager surveys was on the land in possession of the defendants. The testimony of these witnesses was very voluminous, giving the courses, distances, adjoiners, &c., of the land in dispute, with other surveys of the same batch, and adjoining surveys.

20 P. F. SMITH—3

[McDermott *v.* Hoffman.]

He offered in evidence warrants, surveys, patents and treasurer's deeds for the 52 tracts in the names of Daniel Turner and others. The offer was objected to by the defendants, specially because the treasurer's deeds were not evidence to show title or location without first showing a taxation and valid sale for the taxes. The offer was admitted and a bill of exceptions sealed.

He gave in evidence warrant and survey to James Stroud of a batch called the "Richardson batch;" also a number of other. warrants and surveys, including the Lowdon surveys, in relation to which Gwinn testified—as showing the location of the lands in controversy; Gwinn testified also that in his opinion the location of the land was where the plaintiff alleged it to be.

The plaintiff then gave in evidence the records of an ejectment in the Circuit Court of the United States for the Western District of Pennsylvania, in which Murray Hoffman (plaintiff here) was plaintiff, and James McDermott (one of defendants here) and others were defendants for 49 tracts of land.

Gwinn then testified: "I made the survey preparatory to this suit; was there, and a witness in this suit at the time."

The plaintiff then proposed to ask witness "whether the location of the Barton surveys in that trial was the same as claimed by the plaintiffs in this case." The defendants objected to the offer, that the plaintiff could not prove by parol what was decided in that suit.

The offer was admitted, and a bill of exceptions sealed.

The witness testified: "I believe the claim was the same; about the same evidence was produced."

The defendant gave in evidence :—

Application,—leading warrant in the name of James Harris, including Thomas Roop; affidavit made by John Brown March 6th 1794; certified copy of voucher of payment of purchase-money for 74 tracts including Thomas Roop; warrant March 17th 1794, to Thomas Roop for 400 acres: survey, Thomas Roop 406 acres, 72 perches, in 1826, and accepted in pursuance of Act of March 14th 1837, that act recognising that the purchase-money had been paid at the date of the warrants by John Brown; the act provided that nothing in it should impair the title of third persons which had accrued or commenced by warrant or settlement prior to the acceptance. They gave in evidence a conveyance dated October 14th 1837, from John Brown's heirs to James McDermott, in trust for the heirs of Michael McDermott; and proceedings in partition in the Orphans' Court on the estate of Michael McDermott, under which the Roop tract was, July 18th 1857, conveyed to the defendants.

The defendants offered assessments from the commissioners' office, as follows: " Michael McDermott 100 acres, 20 cleared, 1818 " and proposed to show a continuous possession by Michael

[McDermott v. Hoffman.]

McDermott of this land, and also to show an additional assessment to Michael McDermott same year of 100 acres, 9 cleared, valuation $250, and to follow with evidence that this embraces the land on which the Roop warrant was afterwards laid by the defendants in the ejectment, and that Michael McDermott, ancestor of the defendants, was in possession of this land, claiming it as his own, which same land embraces the Roop survey, for the purpose of showing title under the Statute of Limitations.

The plaintiff objected, that taxation in itself is no evidence of title and can be used only as evidence of the extent of claim where the title by the statute or otherwise is first shown.

The offer was rejected and a bill of exceptions was sealed.

The defendants gave evidence, also very voluminous, by William Evans, Henry Scanlon, Anthony Myers, Luke Maguire, Barnabas Myers and Henry Bendon, in answer to the plaintiff's case, and for the purpose of showing that the location was where they alleged it to be.

They then offered in evidence the exemplification of the records of "an action of ejectment: William Barton v. Jacob Smith for a tract of land warranted in the name of John Simpson, for the purpose of showing location, being one of the tracts of the batch known as The Barton 28, surveyed in May 1794, and adjoining Richardson batch, which joins Barton 52, and also as introductory to other evidence showing location of the John Simpson and the adjoining lands, including the land in controversy."

The record contained the bills of exception taken in the case certified, including the evidence, charge of the court, &c.

The plaintiffs objected to the offer: "that it is not between the same parties, or those holding under them or either of them, and is irrelevant as evidence of location. Objections overruled so far as to permit defendants to read the docket entry and the writs; and objections sustained as to the residue of the records; defendants except and bill of exceptions sealed."

They gave in evidence application for lands known as the Isaac Richardson, &c., dated December 25th 1793, for a large number of tracts of 400 acres each, in the name of James Stroud, John Stroud, James Kelly and one hundred and eleven others, respectively.

They offered the following paper, for the purpose of showing the location and boundaries of the lands in controversy, including The Barton 52, Brown and Harris lands, Richardson lands, Hannum and Dilworth lands, and Barton 28, as declared by the owners themselves:

"At a special meeting of the board the 20th April 1795.

Present:          Daniel Brodhead, Esq., S. G. ⎫ of the
                  Francis Johnston, Esq., R. G. ⎬ Land
                  David Kennedy, Esq., Sec'y.   ⎭ Office.

[McDermott *v.* Hoffman.]

"An instrument in writing dated 6th April instant was exhibited to the board in the words following, viz.:

" ' Articles of agreement made and concluded at city of Philadelphia the 6th day of April, one thousand seven hundred and ninety-five, between John Patton, Daniel Turner, Charles Dilworth (in behalf of himself and John Hannum), Alexander Jackson, William Barton, Andrew Norney, John Brown, Isaac Richardson, and John Barron.

" ' Whereas, the said parties are claimants of and have warrants for lands described in and by the general draft made by the aforesaid Daniel Turner, lying in the county of Huntingdon, which said draft is now before them, and being desirous for the mutual accommodation of all the said parties to settle and compromise with each other on fair and equitable principles all matters of disagreement and misunderstanding concerning their respective claims under their several warrants, in order that all controversies relative thereto by or between the said parties may for ever hereafter be prevented and removed.    *    *    *

" ' It is further concluded and agreed by and between all the parties before mentioned that the several articles hereinbefore continued and expressed shall be obligatory on all the parties before mentioned, and shall have their full effect as soon as the honorable board of property shall have adopted and confirmed the terms of this agreement; and it is further agreed by and between the said parties that the aforesaid John Brown shall have fifteen tracts as marked in the name of Brown, in a general draft. Mr. Lambourne, the leading warrant of said Brown to begin on the north-east side of Luke McGuire's tract and to extend south and south-west, adjoining lands as mentioned in the said general draft to be returned by the deputy-surveyor upon the warrants of said Brown, dated the 7th day of March 1794, and the said Brown doth on his part, and on behalf of others concerned with him, for ever quit-claim to all lands adjoining the said fifteen tracts lying north and easterly and south which are included in the lands claimed by the parties aforesaid.

" ' Witness the hands and seals of the parties, &c.'

"Which being read and considered, the same is confirmed, and the deputy surveyor is directed to make return of the surveys of the parties conformably to the said agreement."

"I do hereby certify that the foregoing is a true and correct copy of an agreement as recorded in Minute Book of Property No. 5, pages 9, 10, 11 and 12, now remaining in the office of the Surveyor-General of Pennsylvania.

J. M. CAMPBELL, Sur. Gen'l."

The plaintiff objected to the offer, that the agreement could not

control the returns after they had been returned twenty-one years and patents issued on the lands as returned.

The offer was rejected and a bill of exceptions sealed.

The defendants offered a caveat, dated September 26th 1794, entered by Isaac Richardson and Andrew Norney against the acceptance of the survey of the Barton lands and against the location, boundary and date of each of the tracts known as Richardson, Barton, McMurtrie, Hannum and Dilworth, Brown and Harris.

The caveat set out a large number of warrants in relation to which the caveat was entered, and concludes:

" The said Isaac Richardson and Andrew Norney alleging that they have prior warrants for the land on which the foregoing list of warrants are attempted to be laid except the last eleven which are removed from the land on which they were located; in pursuance of a number of warrants issued the 26th day of December 1793, in the names of James Stroud, John Stroud, James Kelley, and one hundred and eleven others adjoining.

DAVID KENNEDY, Sec'y L. Office."

Attached to it is the following:

" See a compromise between the parties interested in the foregoing caveat, entered among the proceedings of the Board of Property the      day of      1795."

In connection the defendants again offered the agreement before mentioned; all for the purpose of showing location. The plaintiff objected for the same reasons as in the preceding bill of exceptions; the offer was rejected and a bill of exceptions sealed.

To show possession and establish a title under the Statute of Limitations, the defendants gave evidence by Luke Maguire and Andrew Myers that about 1823 Michael McDermott cleared a large field on the land embraced in the Roop warrant, continued to raise grain and claimed it during his life; he lived about half a mile from it. There was a very large amount of evidence on both sides. That which is before stated, the charge of Judge Taylor hereafter given, and the opinion of the Supreme Court, will sufficiently show the cause. No points were submitted by either party.

As the assignments of error embrace almost the whole charge of Taylor, P. J., it is necessary to give it at large, as follows:

" This is an ejectment for two hundred acres of land in Clearfield township, consisting of parts of two surveys, one in the name of Philip Wager, and the other in the name of Hillery Baker.

[" The plaintiff has given in evidence warrants to Philip Wager and Hillery Baker, both dated January 28th 1794, each for 400 acres with a survey made in pursuance of each of 400 acres 133 perches; the former on the 24th and the latter on the 25th of

[McDermott *v.* Hoffman.]

December 1794; and exhibited, also, patents to William Barton for these tracts, dated February 23d 1796.   He followed this with evidence of the assessment of these tracts in Clearfield township as unseated; of Philip Wager for the years 1820 and 1821, and of the sale of it for these taxes on the 10th of June 1822, to Bayard & Barklay; and of Hillery Baker for the year 1825, and of it by the treasurer for the taxes, also to Bayard & Barklay, on the 23d of July 1826.   He has given in evidence also a deed of David Todd, treasurer, to Bayard & Barklay, dated December 30th 1822, for the Philip Wager, and a deed of Stewart Steel, treasurer, dated October 25th 1826, for the Hillery Baker; both duly executed and acknowledged.]

" This has been followed by the record of a suit in equity in the Supreme Court of the State of New York, Mary Murray *et al. v.* Robert Bayard *et al.*, terminating in a decree, which, with the deeds executed in pursuance of that decree, vests, as it appears to show beyond question, the title of Bayard & Barklay, as between these parties, in Murray Hoffman, Jr.   And all this, with what is shown by the return of the writ (if these facts be found by the jury) makes out primâ facie the plaintiff's case, and entitles him to a verdict, unless the defence set up overcomes and is entitled to prevail against it.

" It will be remembered that the defendants have given in evidence a warrant dated March 7th 1794, to Thomas Roop, and a survey made in pursuance of it, 1st October 1836, which it is alleged, and evidence has been given to show, embraces the land in controversy; and they assert title to that survey.   They assert and underake to prove that John Brown paid the purchase-money of that with other tracts; and that through the conveyance of James Ross, dated October 14th 1837, to James McDermott, one of these defendants, the title to this Roop tract was vested, in James McDermott, *in trust* for the heirs of Michael McDermott, deceased.   Michael McDermott, who was the father of both the defendants on the record, was at this time dead.   There is no other evidence of any connection between Michael McDermott and the Roop title except what is found in the conveyance of · James Ross to James McDermott; and the Roop survey itself had been made in 1836, but a year before.   The defendants have further given evidence of a proceeding in partition in the Orphans' Court of this county in 1856, long afterwards, terminating in their purchase at a trustee's sale of the largest portion of the real estate of Michael McDermott, deceased, and it is alleged the portion of it which included the land embraced in the Roop survey, and here in controversy.

[" And while we do not understand it to be alleged or claimed that it is a title which could prevail against the Baker or Wager surveys made forty years before it, it is alleged and claimed that,

[McDermott v. Hoffman.]

taken and viewed in connection with the proof given of the possession of Michael McDermott, there is sufficient disclosed to protect the defendants under the operation of the Statute of Limitations; or, at least, that there is evidence to be submitted to the jury upon that question.

"It is quite evident, however, that in any view that can be taken of what is here proven by the defendants, there is no foundation laid upon which a defence could be rested under the Statute of Limitations. In the first place, Michael McDermott's claim or possession is in no way connected with the Roop survey.

"He was dead before the Roop survey was made in 1836. Besides, there is no evidence that the improvement—that is, the field cleared within the Roop—referred to by the witness, was within that portion of it which constitutes the land in controversy. There is no evidence showing where that field was; and there is no evidence at all showing any definite boundaries, at any particular time, of the possession of Michael McDermott, nor was there twenty-one years from the time this plaintiff asserted his title and recovered upon it, as the evidence shows, and the commencement of this action. In no aspect of this evidence is there any question that we can conceive of to be submitted to the jury; and it is explicitly ruled in Huffman v. McCrea, 6 P. F. Smith 95, a very recent case, that where there is any one element wanting to make out a defence under the Statute of Limitations, it is the duty of the court so to declare, as we now here instruct you. The Roop survey, then, without starting or discussing the question whether the title to it is shown to be vested in the defendants, is not in itself a title which could stand against the plaintiff's surveys, and, with the other evidence given in connection with it, does not, in any view of it, make out a defence under the Statute of Limitations.

"The defendants further allege that their possession, though primâ facie shown by the plaintiff to be within his surveys, is not, in point of fact, embraced in the Baker or Wager surveys, as correctly located on the ground, and that therefore the plaintiff should not recover, but that they on the contrary, for that reason, are entitled to your verdict. Before, however, going to the question of location, to which the controversy would be otherwise here reduced, we notice and dispose of a point made by the plaintiff, and which, if ruled in his favor, would be decisive of the case, and dispense with any further discussion.

"The point made by the plaintiff is, that it being in evidence that an ejectment in the Circuit Court of the United States for the Western District of Pennsylvania, by this plaintiff against a large number of defendants, James McDermott being one of them, and the land now in dispute being in controversy, was brought in 1855, which resulted in a verdict and judgment for the plaintiff

[McDermott *v.* Hoffman.]

in 1857, and in which there was issued a *habere facias possessionem* and possession delivered to the plaintiff—he is entitled to recover here upon his *possession*, without any inquiry into the title between the parties. In the manner in which this case has been tried, we have not been allowed time and opportunity to make as full and careful an examination of this question as we could wish. We have no doubt that, so far as James McDermott, one of these defendants, is concerned, if he had been found again in possession any time within two years after the *hab. fa. poss.* was executed, he might have been again turned out, without further inquiry respecting the title. In 1863, however, when this action was brought, he is found in possession with his brother John, claiming as tenant in common with his brother's title derived through a partition of their father's estate, and claiming also the Roop title; and, worthless and unavailing as their title may be, as compared with the plaintiff's, we are not clear that he is not entitled to be regarded as there under color of title, and not a naked intruder upon the former possession. And John, at all events, may fairly and reasonably claim to stand while he can, upon his evidence of title. Our impression, therefore, is that we would not be warranted in giving you the instruction asked by the plaintiff; and refuse to do it. If wrong in this, and there should be occasion for it, our ruling can be reviewed, and our error corrected.

" The case, then, is thus relieved of everything else but one question. Do the Hillery Baker and Philip Wager surveys, or does either of them, as located on the ground, cover any land in possession of the defendants, when this suit was brought and the writ served?

" The evidence shows that the possession of the defendants at that time was embraced or comprised within the survey in the name of Thomas Roop, made in 1836, more than forty years after the Wager and Baker surveys were made, and many years after these tracts were sold for the taxes to Barklay and Bayard. While, therefore, we repeat that it cannot be pretended or claimed, and is not, that the Roop survey is a title for anybody, which could stand against the plaintiff's surveys, it is alleged and claimed, on the part of the defendants, that they lie four miles distant from the Roop, which embraces the land in their possession. If this be so, or if the evidence so preponderates as to show it, it is an answer to the plaintiff's primâ facie case, and entitles the defendants to a verdict. The plaintiff alleges that his surveys do include the land in controversy; whether they do or not, is now the turning question in the case, and must be so regarded. And it is a question of fact for the jury, to be determined by them, under the direction of the court.

" In this aspect of the case, we do not travel out of the record, or beyond the evidence, in remarking that this is an old contro-

[McDermott v. Hoffman.]

versy in this court, and, we might say, between these parties.   We learn from the evidence that the plaintiff's surveys, the Wager and Baker, are two of a block of 52 connected surveys, called and known as the " Barton surveys," which have been claimed for many years by the plaintiff, or under the title which he represents.

" The first controversy is found in the reported case of Collins v. Barclay, in 7 Barr 67, here cited; determined in this court and in the Supreme Court in 1847, nearly a quarter of a century ago, and upon the question now before us—the true location, upon the ground, of the Barton surveys.   That was an ejectment for Samuel Bethel, one of the block, adjoining Philip Wager, one of these two surveys.   The case was tried in this court, and submitted by Judge White to a jury, who found for the plaintiff, and upon whose judgment a verdict was entered, which was affirmed by the Supreme Court—adopting, as the report of the case shows, the location of the Barton surveys now here claimed by the plaintiff.   Again, to No. 37, October Term 1847, as it appears in evidence, another ejectment was brought in this court by Henry Barklay, for almost the entire block, or over 17,000 acres, against various persons who had got into possession, and resisted his title.   The case was twice tried, with a different result each time; in the first trial there was a verdict for the plaintiff, upon which there was a judgment that was reversed; and upon a second trial there was a verdict and judgment for the defendants.   Subsequently, as the record of it in evidence shows, this plaintiff to May Term 1855, of the Circuit Court of the United States for the Western District of Pennsylvania, brought another ejectment against a large number of defendants, James McDermott, one of these defendants, among them, which was tried before Justice Grier, one of the Judges of the Supreme Court of the United States, holding that court, and an old and experienced Pennsylvania judge, and a verdict was rendered for the plaintiff, upon which there was a judgment, and which after a writ of error was ·sued out and dismissed, was ejected by a writ of *habere fa. possessionem.*   The great question in all these controversies related to the location on the ground of the Barton surveys; and, to June Term 1863, eight years later, all the parties interested, as it seems, not being satisfied, this ejectment was brought by Murray Hoffman, Jr., against James McDermott, a party defendant in the former controversy, and John McDermott, who were found in possession of land which the plaintiff claims to be included in one or the other, or both of two of his surveys, which the defendants deny; and we meet here again, as the turning question, the old controversy respecting the location of the Barton surveys.

" It is time, all must agree, that question should be settled, and it is reasonably to be hoped, for the interest of all the parties, and the repose of the neighborhood, that a question relating to so large

[McDermott *v.* Hoffman.]

a body of lands, and affecting so many individual titles—a question really of public importance—should be here finally and for ever ended.] It now, however, meets us again, and must be here determined. In determining it, it must be decided by the application of settled and fixed principles and rules of law, and, as such, rules of property; [and, before going to the question of location, and the evidence bearing upon it, it seems to be necessary that, after having traced the history of the controversy, we should glance, also, for a short time, at the history of the early appropriation of the lands of the Commonwealth, and of the law governing the making and return of surveys, as it bears upon and affects the title at this time of those holding the lands under those early appropriators.

"We commence by stating that at the end of the proprietary government, and when the public lands were disposed of by the Commonwealth, the regulation was adopted of disposing to any one individual only a limited quantity; so that though one may have felt inclined to purchase thousands of acres, he could, in accordance with the regulations of the land office, only appropriate one tract of something over four hundred. And thence, when there was an effort to obtain large quantities, as was soon found to be the case, this regulation was evaded by the use of fictitious warrantee names, a large number of them representing and giving names to as many different tracts, and it resulted sometimes in the survey and return of large blocks of surveys. Then blocks were made and returned by the deputy surveyor, in the location of a batch of warrants issued at the same time for one man, and were often fixed upon the ground by a line which was perhaps run the whole extent of it, and bounded the block on one side; perhaps not the whole extent of it; and then the other tracts in the block would be laid down by protraction from that line. Sometimes a portion of the surveys were run and marked on the ground, and the others not run or marked; the tracts all calling one for another in its place in the block. Sometimes an occasional interior line was run; and sometimes none of the interior lines were run. Sometimes after one block was laid down, if there was an effort for further appropriation, another block would be attached to it with sometimes the line between the two blocks marked, and sometimes not even that. These blocks of surveys were often made—what work was done on the ground, done, perhaps, before the warrants themselves were in the hands of the officer, his own work, perhaps, or it might be of some one exploring for a party who wished to purchase and speculate in large bodies of lands of the Commonwealth. Afterwards, the surveys would be completed, returned into the office and accepted. Though it was the duty of the deputy-surveyor to run and mark on the ground the lines of every survey he located, this was scarcely ever done in locating

[McDermott v. Hoffman.]

large blocks in mountain localities, and more particularly with respect to interior lines. It followed that such surveys or blocks of surveys, where they stretched over miles of wilderness in mountainous regions, after they would be returned would vary in many respects with regard to waters, especially small streams, and other things that it is not supposable, under the circumstances, the officer would refer to accurately.

"All these difficulties naturally and actually sprung out of this careless and unauthorized mode of executing warrants. It resulted, therefore, that the courts were under the necessity, in order to adjust the title and save and secure the rights of parties who in good faith had acquired title to surveys carelessly and irregularly made and returned, to fix and settle legal rules to meet and overcome the numerous difficulties which would otherwise have led to inextricable confusion and the grossest injustice; and these rules have become rules of property, underlying and upholding the titles derived from the original appropriators of a large amount of the lands of the Commonwealth. They substituted for marked trees, neglected by the deputy-surveyor, legal marks and monuments, which fix and define the owner's survey, and shield and protect his rights, in every instance in which the officer did what he should not have done or left undone what he should have done. These rules and principles have been carefully considered and firmly settled, and have become, and are, necessary rules of property, to be regarded, and reverenced and maintained as such.

"Now, for example, for the purpose of avoiding the difficulty which resulted from the evasion of the regulation that only 440 acres should be granted to one warrantee, by the use of fictitious names, the courts were under the necessity of treating the person who paid the purchase-money and the surveying fees, as the owner, for the purpose of establishing a starting-point in the title of the party who afterwards in good faith became the possessor. That was settled as a rule of law, and became a settled rule of law and of property.

"So, while it was the duty of the deputy-surveyor, on locating a survey, to run and mark the lines on the ground, which in so many instances was not done, after the survey or block of surveys had been returned and accepted and remained in the land office twenty-one years, the rule was adopted and settled as a rule of property that it was presumed and conclusively presumed that it was actually made on the ground as returned, whether marks are found or not, and whether there be evidence that the surveyor had been over the ground or not; and the owner has a right to claim it as a valid survey, to be located by its calls, in the absence of work or marks of its own to fix it. So of blocks of surveys. After twenty-one years, they were to be and are presumed and treated as made on the ground and having their place there; to be

[McDermott *v.* Hoffman.]

located also by their calls, or from some certain starting-point where such exists or can be found; the law still being both with respect to single surveys and blocks of surveys that the lines on the ground, where marks on the ground were made and are found, are to be regarded as the survey. But, in the absence of marks of its own, to fix on the ground a tract or a block, to meet and obviate the difficulty of there being no marks, the rule which we have stated has been necessarily settled and established as a rule of property. It followed that a survey without a solitary mark belonging to it, might be certainly and legally located by attaching it to or starting from a survey for which it calls, and which is found upon the ground, and has marks of its own, or from one lying beyond that again, and found by similar marks or monuments of its own. They may be fixed and attached together by some fixed call that can be ascertained on the ground, and it is in this way, that most of these blocks of surveys are or can be located, and in this way they may be legally and properly located. And if such were not the law, we repeat, the utmost confusion and injustice would have resulted from the manner in which the early surveys of the Commonwealth were made, especially in wild mountainous regions, when comparatively little value was attached to land, and much difficulty experienced in making surveys of large bodies.

"It often happened, also, that where a survey had been made by an officer or one of his deputies, it would be done, and done so as to stretch over or overlap surveys made before, the result of which would always be that the prior survey would hold the land and the junior would be lost should this difficulty occur. Now, in locating blocks of surveys where they had been carefully protracted, and when a starting-point could be obtained, no serious difficulty could occur, each tract having its place in the block, and capable of being fixed by its courses and distances. Indeed, it would have been well if, instead of locating on our system, the Commonwealth had laid out or surveyed her lands, as the General Government did, from meridian lines and in rectangular tracts. It would then be impossible to encounter any difficulties in locating any particular tract. But that was not done here, and hence all this difficulty. Now, with regard to the question here, it is not pretended that the lines of the Barton block of fifty-two surveys are marked upon the ground so as to show where they lie, by any work of their own. It is not alleged that there are any marks on the ground belonging to them that fix the position of the Hillery Baker or Philip Wager, still, in the application of the rules to which we have referred, these tracts are to be located in their places in the block, if the block can be located. They are presumed to have been located on the ground where they are represented to be by the surveys returned into the land office. They

[McDermott v. Hoffman.]

can be located only by locating the block to which they belong; and two theories, each giving them a different location, are presented by the parties and their witnesses.]

[" The defendants here undertake to show that they are not in possession of any of the plaintiffs' land, and that they were not at the time the writ was issued and served upon them. They have introduced evidence for the purpose of showing a location of these two surveys, which would remove them four miles from the land in controversy; and to do this, they undertake to locate them by what they call the Brown & Harris surveys. They have examined Mr. Evans and Mr. Scanlan, surveyors, who, commencing their work at the Roop and the older survey of Luke McGuire, traced the lines of a number of tracts called the Brown & Harris, or Brown & Co., testifying to their work, and producing the blocks from trees marked upon several of the lines of these surveys; and it is to be remarked that this evidence plainly shows the location on the ground of the surveys which they thus traced. And this is not disputed. Indeed, it was a proposition of the counsel of the plaintiffs to save time and trouble by admitting this location of these surveys called Brown & Harris, or Brown & Co. Starting at the point mentioned, they ran through these tracts till they come to where they located Hillery Baker; but it is not claimed that they found any marks or work belonging to it. These surveys called the Brown & Harris are nearly two years younger than the Barton surveys, and of course the older surveys could not be located by the junior. You could not locate a survey by another that was not made at its date. The rule is, that an older survey fixed on the ground, is sufficient to locate a younger survey which calls for it; but it is not the law that an older one may be located by a younger; nor is it a rule or principle of reason. Yet it is in this way mainly that Mr. Evans, as he states, locates where he does the Hillery Baker or Philip Wager, pushing it away or removing it four miles from the land in controversy; on this ground mainly, and on what is claimed to be indicated by the representation of the waters, and what he discovered tending to lead him to that opinion in the combination of blocks of surveys which he made in the land-office, but more particularly upon the call of one of the plaintiffs' surveys,—the Baker or Wager,—for 'Brown & Co.' How that call came to be there, or what surveys it relates to, must be a matter of speculation or conjecture, for there is nothing here which determines it. There is some evidence that there is another body lying some distance off, in another direction, referred to in the evidence of location by the plaintiff, to which it may refer; but, however that may be, or whatever the explanation may be, you cannot locate an old survey by one made two years afterwards. It is claimed here in addition, we say, on the part of the defendants, that the correspondence of the streams

[McDermott *v.* Hoffman.]

on the drafts, particularly in connections, and other evidence here which has been the subject of comment, aid and strengthen their hypothesis or theory of location, which it is necessary for them to establish or make out, in order to succeed in their defence.]

[" On the other hand, the plaintiff starts at a point on an old, well-established and acknowledged body of surveys known as the 'Lowdon,' north of where these Bartons lay, and with respect to their surveys, their location and the 'Lowdon beech,' a well-known marked tree belonging to them, there is no controversy.   There is a fixed and certain starting-point by which it is claimed that the Barton may be located just as certainly as by marks of its own, at one end or at one side of the block; for it is alleged that while the starting-point is fixed and certain, the connection is well established between the one and the other of these two blocks of surveys.

" The testimony of Judge Gwinn is, that running from the Lowdon beech by the old work which is found there, in his professional judgment the Bartons can be and are located.   You have heard his testimony to that effect, so also the testimony of Richard J. Proudfoot, in his deposition, which you have read; so also the testimony of Major Hough, who testifies that the Bartons can be and are certainly located from the Lowdon beech.   If this be so, as these surveyors all testify, their testimony locates the Barton 52 where the plaintiff claims them to be, and so that the Baker and Wager tracts would include the land in controversy.

" It is further alleged by the plaintiff that these tracts are located in the same place from another point by the Richardson, a block of surveys made in the same year, and about the same time, the two blocks being cotemporary surveys, and calling for one another.   And here we have the testimony of Judges Gwinn, Proudfoot and Gibboney, all fixing, in their judgment, the location of the Richardson, so as to place the Barton 52 where the Loudon would put them, locating from the other end.   This is cumulative and strongly corroborative evidence, tending to fix the Baker and Wager tracts where the plaintiff claims them to be. There was some evidence, it is true, offered by the defendants to show that another batch called the Barton '28' are located down in the valley, off the mountain, which tends to show, as it is claimed, that the Richardson is located in a different place; but the testimony of William Reed, Esq., on that subject, who made an examination of the lines of that batch long ago, and also of the Richardson, is positive as to the connection of these two blocks on the side of the mountain, where it seems the other witnesses of the plaintiff put them.   Now, if the Richardson lie there, and the Richardson and Barton call for one another as lying together, that location of the Richardson would locate the Barton.   From either standing-point the Loudon or the Richardson, in the judg-

[McDermott *v.* Hoffman.]

ment of the witnesses of the plaintiff, his surveys may be located; and if from either the two branches of his evidence together, tending to the same point and corroborating each other, would seem, if the witnesses are believed, to furnish clear proof of the location claimed by the plaintiff.

"This is of course a question for the jury. In view of the manner in which these old surveys were made and returned, it is scarcely to be expected that everything bearing upon the question of location, when a survey or block of surveys has to be identified or fixed upon the ground by evidence, would point the same way. On the contrary, it is not unusual to find disclosed grounds for conflicting theories of location. In addition to sources of difficulty already noticed, there may be errors, as in tracing waters, particularly small streams, and sometimes discrepancies or conflict between the calls of warrants and the surveys upon them, &c. As to such matters, it may be observed that the tracing of small streams upon blocks of surveys which have been mainly made by protraction, is not to be regarded as of much significance when found in conflict with calls and marks otherwise sufficient to identify and locate the surveys; and the calls of a survey, after it has been returned and accepted, are of more weight than the calls of the warrants where they do not agree. But where there is conflict in the evidence afforded by the calls or marks, or anything else indicating or tending to show where the tract lies, and to identify it on the ground, then the jury must be governed as when they have to deal with discrepancies in testimony of witnesses. They must reconcile it if they can, and from the best conclusion they can form the whole evidence. And while the evidence in this case would seem to us to locate these surveys where the plaintiff claims them to be, it is, we repeat, not a question for the court but for the jury.

"It will be remembered that if the evidence shows the location of the Barton *block*, it shows the location of every part of it. It is observed by Judge Woodward, in one of the cases here cited, that 'the marks on any part of the block, or belonging to it, belong to each tract of the block.' And so it was said by the Supreme Court in Collins *v.* Barclay, 7 Barr 67—a controversy respecting one of these Barton tracts, the Samuel Bethel, adjoining the Hillery Baker, and upon this very question—Judge Burnside delivering the opinion: 'The whole fifty-two tracts were located and fixed by adjoining bodies of surveys; on the north the Loudon & Co.; north-east Captain Rickets, now McMurtrie, Richardson & Co., now Morgan and others; by the latter to the south-east, and some surveys of Philips located in the angle formed by the Richardson & Co. surveys.' 'Samuel Bethel and every other survey of the fifty-two tracts are as easily designated

[McDermott *v.* Hoffman.]

on the ground as if every line had been actually run and marked on the ground.'

"With this we submit the case to you. We instruct you that the plaintiff, having a primâ facie case, is entitled to recover unless the evidence, all considered, so preponderates as to show a location of the Barton surveys, which would remove the Baker and Wager tracts away from the land in controversy, as claimed by the defendants, in which case your verdict should be in their favor. But if it fails to do so, or on the contrary shows, as it seems to us, that these tracts lie where the plaintiff claims them to be, then we repeat your verdict should be for the plaintiff."]

The verdict was for the plaintiffs.

The defendants took a writ of error, and assigned for error:

2. Rejecting the exemplification of the agreement between Daniel Turner and others.

3. Rejecting the exemplification of the records of the suit, William Barton against Jacob Smith.

4. Rejecting the exemplification of the caveat.

5. Admitting the testimony of James L. Gwinn to prove that the location claimed by the plaintiff in the suit in the Circuit Court of the United States was the same as claimed in this suit.

6. Admitting the assessment of unseated lands in Allegheny township.

7. Admitting treasurer's deeds of tracts in the name of Daniel Turner and others.

8. Rejecting assessment of lands to Michael McDermott.

9. Because no special venire had been issued for struck jury.

10. Allowing peremptory challenge to struck jury.

11–15. The parts of the charge in brackets.

*George M. Reade,* for plaintiffs in error, cited:

2d assignment, Weidman *v.* Kohr, 4 S. & R. 174; Strickler *v.* Todd, 10 Id. 63; Buchanan *v.* Moore, Id. 275; Gibblehouse *v.* Stong, 3 Rawle 437, 442; Reed *v.* Dickey, 1 Watts 152; Hiester *v.* Laird, 1 W. & S. 245, 249; Maus *v.* Maus, 5 Watts 315; Mills *v.* Buchanan, 2 Harris 59; Caufman *v.* Cedar Spring, 6 Binney 59; Hamilton *v.* Menor, 2 S. & R. 70; Dawson *v.* Mills, 8 Casey 302; Gratz *v.* Beates, 9 Wright 495; McCausland *v.* Fleming, 13 P. F. Smith 36; Conn. *v.* Penn, Peters C. C. R. 511; Collins *v.* Barclay, 7 Barr 67.

3d assignment: Foster *v.* Shaw, 7 S. & R. 156; McKinney *v.* Crawford, 8 Id. 351; Moore *v.* Smith, 14 Id. 388; Martin *v.* Kaffroth, 16 Id. 120; Rice *v.* Bixler, 1 W. & S. 445; Barr v. Gratz, 4 Wheaton 213; Urtetiqui *v.* D'Arcy, 9 Pet. (S. C.) 692; Truby *v.* Seybert, 2 Jones 101; Patterson *v.* Anderson, 4 Wright 359; 1 Greenl. Ev., § 527, 527*a.*; White *v.* Bisbing, 1 Yeates 400; Montgomery *v.* Dickey, 2 Id. 212; Jackson *v.* Winchester, Id. 529;

[McDermott v. Hoffman.]

Caufman v. The Pres. Con. Cedar Spring, 6 Binney 59; Magill v. Kauffman, 4 S. & R. 317; Hough v. Trouts, 2 Penn. R. 198; Moore v. Pearson, 6 W. & S. 51; Buchanan v. Moore, 10 S. & R. 275, 281; Nieman v. Ward, 1 W. & S. 68; 1 Greenl. Ev. § 145; Bassler v. Niesly, 1 S. & R. 431; Munderbach v. Lutz, 14 Id. 125; Snowden v. Warder, 3 Rawle 101; Hamilton v. Moore, 4 W. & S. 570; Meese v. Levis, 1 Harris 384; Levers v. Van Buskirk, 4 Barr 309.

4th assignment: Louden v. Blythe, 4 Harris 532; s. c. 3 Casey 22; Potts v. Everhart, 2 Id. 493; Kenyon v. Ashbridge, 11 Id. 157; Tompkins v. Saltmarsh, 14 S. & R. 275; Reed v. Dickey, 2 Watts 459; Cattison v. Cattison, 10 Harris 275; 1 Greenl. Ev. § 109–111.

5th assignment: Marsh v. Pier, 4 Rawle 273; Meyers v. Hill, 10 Wright 9; Seitzinger v. Ridgway, 9 Watts 496; Drexel v. Man, 2 Barr 267; Treaster v. Fleisher, 7 W. & S. 137; 1 Greenl. Ev. § 440–441; Ormsby v. Ihmsen, 10 Casey 462.

6th assignment: 3 Smith's Laws 394–395; 4 Id. 514, 516, 530; 5 Id. 252; 1 Id. 334, 346; 2 Id. 13; Dunlop's Dig. 638; Bratton v. Mitchell, 1 W. & S. 310; Miller v. Hale, 2 Casey 432; McReynolds v. Longenberger, 7 P. F. Smith 13; Heft v. Gephart, 15 Id. 510.

7th assignment: Blair v. Waggoner, 2 S. & R. 472; Waln v. Shearman, 8 Id. 357; Birch v. Fisher, 13 Id. 208; Stewart v. Shoenfelt, Id. 360.

8th and 12th assignments: Gross v. Reddig, 9 Wright 406; Davis v. Keefer, 4 Binn. 161; Jones v. Brownfield, 2 Barr 55; Dime Sav. Inst. v. Allentown B'k, 11 P. F. Smith 391; Miller v. Shaw, 7 S. & R. 129; Boyer v. Benlow, 10 Id. 303; McCall v. Neely, 3 Watts 69, 73; Sorber v. Willing, 10 Id. 141; Hockenbury v. Snyder, 2 W. & S. 240, 252; Bell v. Hartly, 4 Id. 32; Bigler v. Karns, Id. 137, 140; Hughs v. Pickering, 2 Harris 297; Porter v. McGinnis, 1 Barr 413; Sheik v. McElroy, 8 Harris 25; McCombs v. Rowan, 9 P. F. Smith 414; Moore v. Greene, 19 Howard 69; Harris v. Dennis, 1 S. & R. 236; Workman v. Guthrie, 5 Casey 495; Pederick v. Searle, 5 S. & R. 236; Mercer v. Watson, 1 Watts 330, 338; Lewis v. Bradford, 10 Id. 67; Sailor v. Hertzog, 4 Whart. 259; Graffius v. Tottenham, 1 W. & S. 488; McCall v. Coover, 4 Id. 151.

9th assignment: 2 Tidd's Prac. 793; Roberts' Dig. 326, 336, 400; Hall v. Perott, Baldwin's R. 123; Act of April 14th 1834, § 151, Pamph. L. 368; § 1, Pamph. L. 378, 1 Br. Purd. 837, pl. 74, 671, pl. 16.

10th assignment: 1 Troub. & H. 536, 532; Sparrow v. Turner, 2 Wilson 336; Hubley v. White, 2 Yeates 133; Atlee v. Shaw, 4 Id. 236; Patton v. Ash, 7 S. & R. 116; Wenrick v. Hall, 11 Id. 153; Funk v. Ely, 9 Wright 444; Blanchard v. Brown, 1 Wal-

20 P. F. SMITH—4

[McDermott *v.* Hoffman.]

lace, Jr., 309; Schwenk *v.* Umsted, 6 S. & R. 351; Sch. Nav.
Co. *v.* Farr, 4 W. & S. 362.

11th assignment: Work *v.* Maclay, 2 S. & R. 415; Deal *v.*
McCormick, 3 Id. 343; Selin *v.* Snyder, 11 Id. 319; Relf *v.*
Rapp, 3 W. & S. 21; Brown *v.* Clark, 2 Harris 469.

13th assignment: Evans *v.* Mengel, 6 Watts 72; Hannay *v.*
Stewart, Id. 487; Switland *v.* Holgate, 8 Id. 385;' Whitehill *v.*
Wilson, 3 Penn. R. 405; Evans *v.* Mengel, 1 Barr 68; Sartwell
*v.* Wilcox, 8 Harris 117; Del. & Hud. Can. Co. *v.* Torrey, 9 Casey 143.

14th and 15th assignments: Richardson *v.* Boston, 19 Howard
263; Packet Co. *v.* Sickles, 5 Wallace 580; Coleman's Appeal, 12
P. F. Smith 252; Reeves *v.* Del., Lack. & West. Railroad, 6 Casey 454.

*Samuel S. Blair* and *Robert L. Johnson,* for defendant in error,
cited:

6th and 7th assignments: Heft *v.* Gephart, 15 P. F. Smith 510;
Troutman *v.* May, 9 Casey 455; McCausland *v.* Fleming, 13 P.
F. Smith 36.

8th assignment: Goft *v.* Weakland, 10 Casey 304; Nearhoff *v.*
Addleman, 7 Id. 279; Huffman *v.* McCrea, 6 P. F. Smith 95.

9th and 10th assignments: Act of April 14th 1834, § 151, *supra;*
Act of 19th March 1785, 2 Dall. Laws 267; Dunlop's Dig. 147;
3 Bl. Comm. 357; Wood Inst. 586; 1 Troub. & H. Pr. 536;
Acts of April 14th 1834, §§ 97, 98, Pamph. L. 358, March 29th
1860, § 1, Pamph. L. 344, 1 Bright. Purd. 832, pl. 24, 837, pl.
72; Schwenk *v.* Umsted, 6 S. & R. 351; Sch. Nav. Co. *v.*
Farr, 4 W. & S. 362; Wayman *v.* Southard, 10 Wheaton 1; Act of
April 14th 1834, § 159, Pamph. L. 363, 1 Bright. Purd. 837, pl. 78.

12th and 15th assignments: Ramage *v.* Peterman, 1 Casey 349;
Eister *v.* Paul, 4 P. F. Smith 196; Malone *v.* Sallada, 12 Wright
419; Carbon Run I. Co. *v.* Rockafeller, 1 Casey 49; Bellas
*v.* Cleaver, 4 Wright 260; McGowan *v.* Ahl, 3 P. F. Smith 84;
Collins *v.* Barclay, 7 Barr 67.

The opinion of the court was delivered, November 6th 1871, by
SHARSWOOD, J.—The 1st assignment of error has been abandoned, it having been ascertained that it was not founded on fact.

The 2d assignment is to the rejection by the court below of
the certified copy of an agreement between the original owners of
the surveys, or the lands in controversy, produced by them before
the board of property upon a caveat dated April 6th 1795, to the
acceptance of the returns of certain surveys. It was offered as
evidence of location and boundaries. It is too clear for argument
and, indeed, has not been disputed, that this agreement could not
shift the actual location of the tracts in controversy, as ascer-

[McDermott *v.* Hoffman.]

tained by the original surveys made on the 24th and 25th August 1794—returned into the office of the surveyor-general, and patents thereupon issued to the owner of the warrants on February 23d 1796.   But it is contended that this agreement is evidence of an admission by William Barton, the patentee, of the location of the surveys, which ought to have been allowed to go to the jury to be considered by them with the other evidence in the cause upon that subject.   The agreement upon its face appears to have been made upon the basis of a draft or plat by Daniel Turner, "which said draft," it recites, "is now before them," the parties.   This draft or plat was not produced, and its non-production is not attempted to be accounted for except by the mere allegation that it is not to be found in the land office.   From nothing before us can we infer that it was an official paper which ought to have been in the land office—although it is not improbable that it was—for Daniel Turner was an assistant of Col. Canan, a deputy surveyor at that time. " He made numerous surveys, and Col. Canan returned them to the office :" 7 Barr 72.   Without that draft, to argue from an agreement, which at the most settles the boundary line of the surveys belonging to John Hannum and Charles Dilworth, as described in it, should have any legal operation in determining the proper location on the ground of the surveys of the Philip Wager and Hillery Baker warrants, belonging to William Barton, was a pure matter of speculation, and would be much more likely to mislead the jury than to assist their inquiries.   With the draft before them upon which, perhaps, the surveys upon these very warrants were laid down, it might have been of some assistance ; for the agreement expressly provides " that the surveys made or to be made for the before-mentioned parties to these presents (including those of William Barton, the patentee), as the same are laid down in the general draft aforesaid for the other parties therein named, shall be and remain as they are therein laid down and described." It is evident that no alteration was intended to be made in the location of these other surveys, and without Daniel Turner's draft we are thrown necessarily upon other sources from which to determine their location.   In Collins *b.* Barclay, 7 Barr 67—a case heard and decided in this court more than twenty-four years ago—an ejectment for one of the tracts in this block of surveys in which this agreement was in evidence, it was determined that it could have no effect upon the question of location, as I understand the opinion of Mr. Justice Burnside, either in fact or in law.   He says : " No regard was paid to the calls of the warrants, for that would have made them interfere with each other ; nor to the agreement ; but the returns were generally if not altogether made by Turner's draft.   The owners of this large body of warrants never complained.   Those returns were received and have remained accepted in the land office for more than half a century ; and

[McDermott *v.* Hoffman.]

whether there was a subsequent agreement of the parties changing the former arrangement before the board of property, is at this distance of time immaterial. The tract in question, as well as the lands in general, have been long since patented. The original owners have all paid the debt of nature; neither their representatives nor any subsequent intruder will be allowed to disturb their returns." As indeed the agreement proposed merely to settle the boundary line of the Hannum and Dilworth surveys, with which there seems to have been some interference, and to be a quit-claim or release by the owners of these surveys "to all other lands included or described in the aforesaid draft (namely of Daniel Turner), lying to the northward and north-eastward of the before-mentioned line (namely the agreed boundary of Hannum and Dilworth), running the course of south 30 degrees east;" it is not easy to perceive how this agreement can legitimately be considered as an admission by William Barton, that the compromise line or the Spanish oak at the corner where it starts were monuments, which had anything to do with determining the particular location of the Philip Wager and Hillery Baker surveys which by concession lie at a considerable distance from it. We are of opinion, therefore, that there was no error in the rejection of this paper.

The 3d error assigned is to the rejection of the record of a suit, William Barton against Jacob Smith, in the Court of Common Pleas of Huntingdon county. This suit was between other parties, and for other lands, though it may be, lying in the same block with those now in dispute. This record could certainly not have been given in evidence by William Barton or the plaintiffs below claiming under him against the defendants below; why then should it be admissible in their favor and against him? I understand the contention now to be, that it may be evidence to show what were the grounds upon which he rested his claim in that case, and the location he then set up; and this by the notes of the testimony attached to the bills of exceptions which form part of the record. I pass entirely the question whether the bill of exceptions though attached to the record, is strictly any part of it, or if it is, whether the signature and seal of the judge, *diverso intuitu*, to certify his rulings to the court of errors, is a sufficient authentication, and can supply the oath of a witness that the evidence is the full substance of what the witnesses said. These notes of testimony are offered, it is said, as admissions by William Barton himself. But this is to carry the doctrine of admissions much further than it ever has been done. No decision can be found, which holds that the evidence of a witness produced by a party on the trial of a cause can be used against him as an admission in any subsequent suit between other parties, and relating to another subject of controversy. See Ayres *v.* Wattson, 7 P. F. Smith 360. It would be perilous, indeed, to any party to produce and examine a witness in court, if all that

[McDermott v. Hoffman.]

he might say could afterwards be used in evidence against him as an admission. He admits, indeed, by producing him, that he is a credible witness but only *pro hac vice*, so far as that case is concerned. He does not admit that everything he says is true either in that or any other proceeding. A party in the same suit may give evidence which contradicts his own witness or shows that he was mistaken, though he cannot directly impeach his veracity. The case of Truby v. Seybert, 2 Jones 101, cited in the paper-book of the plaintiffs in error, does not sustain their contention. The point ruled in that case was, that if a party or his counsel in his defence make a concession of a fact within his own knowledge, which is pertinent in another issue with another plaintiff, the record of the first suit as introductory to evidence of the concession, and the concession itself, though proved by parol, are good evidence for the new plaintiff; and what is said by Mr. Justice Bell in that case is certainly true that a record between other parties may be admissible in evidence whenever it contains a solemn admission or judicial declaration by any of such parties in regard to the existence of any particular fact. But this certainly falls far short of holding that what is declared by a third person, produced as a witness, is to be received and treated as an admission by the party producing him.

The 4th assignment of error is to the rejection of a certified copy of the caveat of Richardson and Norney, dated September 26th 1794, against the acceptance of the surveys known as the Barton surveys, which was accompanied with a re-offer of the agreement of April 6th 1795, before referred to. The same reasons which have been given to show the irrelevancy of that agreement, standing by itself, apply equally to this offer, and this assignment is therefore dismissed.

The 5th error assigned is to the admission of the testimony of James L. Gwinn, a witness called by the plaintiff below for the purpose of proving that the location claimed by the plaintiff on a former trial in the United States court in 1857, the record of which was in evidence, was the same as alleged in the present trial. That former suit was clearly admissible as persuasive evidence in this : Koons v. Hartman, 7 Watts 20 ; Levers v. Van Buskirk, 4 Barr 309. At all events it was in evidence, and we are not now dealing with the question of its admissibility. When the record of a former suit is in evidence it is settled that a party may give parol evidence of what transpired on the former trial, in order to show that it was the same subject-matter, and the same title which was then passed upon : Brindle v. McIlvaine, 10 S. & R. 282 ; Haak v. Breidenbach, 3 Id. 204 ; Carmony v. Hoober, 5 Barr 305. This of course is not to contradict the record but to explain it.

The 6th assignment of error is to the admission in evidence of

[McDermott *v.* Hoffman.]

the assessment of unseated lands in Allegheny township, and the treasurer's deed for the Philip Wager tract. The book produced was proved by one of the commissioners of the county to be the original assessment. This book contained the name of the warrantee, the number of acres in the tract, the valuation and the rate. The amount of the tax was not carried out, but that was a mere matter of calculation. The land becomes debtor for the tax by being returned assessed and valued, and the rate per cent. fixed: carrying out the amount of the tax is merely clerical: Heft *v.* Gephart, 15 P. F. Smith 510.

The 7th assignment of error is to the admission of several other treasurers' deeds for other tracts in the same block for the purpose not of showing title but location. This was objected to specifically because the offer was not preceded or accompanied with evidence that there was an assessment and valid sale for taxes. Undoubtedly had these deeds been offered to show title under them, the objection would have been a good one. But if they would have been admissible if shown to have been founded upon valid sales to prove location, they were equally admissible without such preliminary proof: Sample *v.* Robb, 4 Harris 319; McCausland *v.* Fleming, 13 P. F. Smith 36.

The 8th and 12th assignments of error may both be considered together, as they relate to the defence set up of the bar of the Statute of Limitations. There was no evidence of possession by the defendants of any part of the Philip Wager and Hillery Baker tracts, which were the premises claimed in this ejectment. There was no evidence, as the learned judge instructed the jury, that the field cleared within the Roop survey was within that portion of it which interferes with the Philip Wager and Hillery Baker surveys; nor has any such evidence been pointed out to us upon this record. The burden of establishing an adverse possession to create the bar of the statute is undoubtedly upon the party who sets it up. The evidence given by Anthony Meyers and Luke Maguire is of the vaguest kind. They prove at most only an improvement upon some part of the Thomas Roop survey, but there is nothing in what they say from which an inference can be drawn that it was within the lines here claimed by the plaintiff below. If so, the evidence of the assessment of taxes to Michael McDermott for seated lands was clearly inadmissible. It was no evidence of title or possession, and while it might have been corroboration of other evidence on that subject, if any such had been given, in its absence it was totally irrelevant.

As to the 9th assignment of error, that after the court had ordered the cause to be tried by a struck or special jury, no special venire facias was issued to summon the jury so selected, it is enough to say that no Act of Assembly requires it. The learned counsel for the plaintiffs in error falls back upon the

[McDermott *v.* Hoffman.]

common law of England, and he may be right in regard to that law; for in England when a special jury is ordered, the sheriff attends with his freeholders' book, from which the prothonotary of the court selects indifferently forty-eight names, from which the jury is struck and a venire issues to summon them: 3 Bl. Com. 357. But we have in this state a common law of our own, founded on uniform usage, and adapted to our habits and principles. Special jurors are not required to be freeholders, and a special jury is always struck from the panel returned to the general venire issued for the court, containing the names "which shall have been drawn from the proper wheel for the ensuing court." A special venire is only required in case of a view: Act of April 14th 1834, Pamph. L. 368. Be this as it may, the defendants did not challenge the array, which was the only proper mode of raising the objection. At all events, the exception should have been taken before the jury were sworn. They went to trial without objection, and it is too late for them now to complain.

The 10th assignment of error is, that the court allowed the plaintiff to challenge peremptorily one of the jurors upon the struck list. The words of the Act of Assembly of March 29th 1860, Pamph. L. 344, are: "on the trial of all civil suits now pending, or hereafter brought in any of the courts of this Commonwealth, the plaintiff and defendant shall each have four peremptory challenges." However it may have been, had the question been *res integra*, it must now be considered as set at rest both by inveterate practice, and the early recognition of that practice by this court in Schwenk *v.* Umsted, 6 S. & R. 354.

The 11th assignment of error is grounded upon what was evidently a mere *lapsus linguæ* of the learned judge in stating the date of the surveys on the Philip Wager and Hillery Baker warrants to have been December 1794 instead of August of that year. In the connection in which the mistake occurred it could not have misled the jury, and even if it might, it was the duty of the defendants' counsel to have called the attention of the learned judge to it at the close of his charge, when no doubt it would have been at once corrected.

The remaining assignments of error are to the charge of the learned judge upon the principal question in the cause—the proper location on the ground of the Philip Wager and Hillery Baker surveys. This was a question of fact for the jury, and so they were distinctly instructed. The views of the learned judge upon the evidence expressed upon this point did not trench upon their province. Upon a question of this character, to be determined upon a great mass of complicated testimony, alleged to be contradictory and conflicting, it was not only his right but his duty to assist the jury by his knowledge and experience in threading the maze. We see no just ground which the plaintiffs in

[McDermott *v.* Hoffman.]

error have to complain of any part of the charge, which was certainly both learned and lucid—two qualities which do not always go together.

Judgment affirmed.